UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Mark Chinander,                                                        Civil No. 07-4565 (DWF/AJB)

          Plaintiff,

v.                                                             **MEMORANDUM**
                                                             **OPINION AND ORDER**
Andersen Windows, Inc.,
a Minnesota Corporation,

          Defendant.

___

Nicholas G. B. May, Esq., Fabian May & Anderson, PLLP, counsel for Plaintiff.

David M. Classen, Esq., and David M. Wilk, Esq., Larson King, LLP, counsel for Defendant.

___

## INTRODUCTION

This matter is before the Court on a motion for summary judgment brought by Defendant Andersen Windows, Inc. ("Andersen"). For the reasons set forth below, the Court grants Andersen's motion.

## BACKGROUND

Andersen is a window manufacturer. Its headquarters and main plant are located in Bayport, Minnesota. Plaintiff Mark Chinander worked for Andersen for over twenty years. Chinander worked as a value stream associate and his main responsibility was to work in the dip tank. The dip tank is a large tank where loads of wood are treated with chemicals. The chemicals used in the dip tank are considered hazardous. All employees

who work in the dip tank receive training specific to the dip tank (including hazardous material training) as well as more general "on-the job" training.  (Aff. of Nicholas G. B. May ("May Aff.") ¶ 2, Ex. 5 (Dep. of Daniel Hoel ("Hoel Dep.")) at 15.)

In January 2007, Chinander requested and was granted medical leave under the Family Medical Leave Act ("FMLA") because he needed surgery on his foot.  While on leave, Chinander claims that his primary contact was Michelle Helm, a human resources specialist at Andersen.  Chinander asserts that Helm was dismissive and unresponsive to questions he had during his leave.  In all, Chinander received nineteen weeks of paid medical leave.  (Aff. of Nancy L. Merritt ("Merritt Aff.") ¶ 20.)  When Chinander first returned to work in or around July 2007, he was assigned to the paint line, where he was required to work standing up.  (May Aff. ¶ 2, Ex. 15 (Dep. of Bonnie Christensen ("B. Christensen Dep.")) at 6-7.)  Chinander informed his supervisor on the paint line that he could not stand for long periods of time.  (B. Christensen Dep. at 6-7.)

On July 9, 2007, Chinander returned to work in the dip tank.  (May Aff. ¶ 2, Ex. 1 (Dep. of Mark Chinander ("Chinander Dep.")) at 185.)  At that time, Chinander reported primarily to Daniel Hoel and Thomas Steele, who in turn reported to Chad Christenson.[1]  Upon his return to the dip tank, Chinander perceived what he believed to be several safety concerns relating to the operation of the dip tank in his absence.  Chinander was particularly concerned that another worker, Brad Williamson, was not properly trained.  Chinander shared his concerns with Diana Clayton, an Andersen employee who was a

---

[1]   Christenson was a "value stream manager" who oversaw the dip tank.

2

Safety Coordinator. (May Aff. ¶ 2, Ex. 4 (Dep. of Diana Lynn Clayton ("Clayton Dep.")) at 14-16.) At Clayton's request, Chinander drafted a written summary of his concerns. The summary reads:

> Factory Advisor:
>
> Why did they farm the dip-tank operator out of CC507 this spring and put somebody that has never worked in there before. It seems to me that would be kind of dangerous especially when the supervisors don't know how to run it. No one even trained this person. It is a hazardous area and the operators are well trained in procedures in case of emergencys [sic]. I don't believe an untrained employee should be in such a critical position as to be trusted not to blow the place up.
>
> Safety Issue: The supervisors in CC501 let both dip-tank oper. have P.T.O. for the whole week of the 4th untrained associates filled in.
>
> Mark Chinander
> 05297
> Dip-Tank 507

(May Aff. ¶ 2, Ex. 24.) Clayton raised Chinander's concerns at a July 2007 safety committee meeting. (Clayton Dep. at 24.) Chad Christenson was present at the meeting. After the meeting, Clayton, Christenson, and Kurt Abramson, a senior site safety specialist, discussed Chinander's report. (Clayton Dep. at 24-27.)

Chinander also spoke with Scott Steenerson about the perceived safety concerns. Steenerson is an Andersen employee who was also a member of the factory advisory committee. (Aff. of Scott Steenerson ("Steenerson Aff.") ¶ 3-4.) Steenerson communicated Chinander's concerns to the factory advisory committee at a meeting on July 18, 2007. (Steenerson ¶ 3-5.) Also present at this meeting were Steve Kirby, the plant manager, and Linda Seibel, a human resources manager.

3

On July 17, 2007, Chinander was issued an "Unusual Incident Report" indicating that Chinander had exceeded allowable unplanned paid time-off. (May Aff. ¶ 2, Ex. 21.) Chinander asserts that the report was unwarranted because some of the time off was due to his FMLA leave. Thomas Steele, who supervised the dip tank, issued the report.

While on a 5:00 p.m. break on July 18, 2007, Chinander entered the Andersen cafeteria and took a sandwich, a drink, and possibly a bag of potato chips without paying. Sarah Nowling, a cafeteria service worker,[2] saw Chinander take the sandwich and heard him take chips and a drink out of the cooler without paying for the items. (May Aff. ¶ 2, Ex. 11 (Dep. of Sarah Nowling ("Nowling Dep.")) at 46.) Nowling then walked to the cafeteria entrance to see if any money was left at the counter.[3] She did not find any money. Two other Andersen employees, Kevin Booth and Mike Fehlen, also claim that they saw Chinander take food items without paying. Booth and Fehlen reported the incident to their supervisor, Hoel. Hoel met with Nowling that same day and Nowling stated that she thought Chinander took food items without paying. Hoel then sent an e-mail to Helm and Christenson about the incident. (Aff. of David M. Wilk ¶ 4, Ex. 3.) Helm began an investigation into the alleged incident. As part of the investigation, Helm and Hoel interviewed Chinander. During the interview, Chinander admitted that he left the cafeteria on July 18 without paying for food items, but claimed that he returned to the

---

[2]   Bayport Food Services, a company unrelated to Andersen, operates the Andersen cafeteria.

[3]   The day before, Nowling had witnessed Chinander take food, but found money on the counter and "gave him the benefit of the doubt that that was his money that day." (Nowling Dep. at 43.)

cafeteria later that evening and left money on the back counter. Helm asked Chinander what he had taken and how much money he left. Chinander could not remember what he took and claimed that he left five dollars. Hoel and Christenson also interviewed Chinander regarding the alleged theft. During this interview, Chinander reported that he left a different amount of money than the amount he had told Helm. (May Aff. ¶ 2, Ex. 3 (Dep. of Chad Christenson ("C. Christenson Dep.")) at 71.)

Helm also interviewed Nowling. Nowling told Helm that she never found enough money on July 18 to pay for the items Chinander took. (Nowling Dep. at 53 ("The $5 he indicated that he went back to put on the counter, it wasn't there.").) Hoel and Christenson also interviewed Nowling, at which time Christenson repeatedly asked Nowling whether she found any money where Chinander claimed to have left his money. Nowling stated that she did not find any money. (Nowling Dep. at 73.)

After completing the investigation, Helm and Christenson met with Kirby, the plant manager, and told Kirby about the alleged theft and the ensuing investigation. Christenson recommended, and Kirby agreed, that Chinander be terminated. The written Termination Recommendation notes that Chinander was terminated as of July 25, 2007, and the reason for his termination was his violation of the Andersen guideline on theft. (May Aff. ¶ 2, Ex. 22.) Helm, Christenson, and Kirby all signed-off on the termination recommendation. In addition, Seibel, Nancy Merritt (a Human Resources Director), and Jeff Anderson (Kirby's boss), all approved the termination.

On November 7, 2007, Chinander commenced the present action. In his Complaint, Chinander alleges that Andersen violated the FMLA and wrongfully

terminated him in violation of Minnesota's Whistleblower Protection Act. Andersen denies that Chinander's termination was wrongful or retaliatory. Andersen instead argues that Chinander was fired because he took food without paying. Presently before the Court is Andersen's motion for summary judgment.

## DISCUSSION

### I. Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials but must set forth specific facts showing that

there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II. FMLA Discrimination

The FMLA provides eligible employees up to twelve weeks of unpaid leave in any twelve-month time period and prohibits employers from discriminating against employees for exercising their rights under the FMLA. *See* 29 U.S.C. §§ 2612, 2615(a)(2). "Basing an adverse employment action on an employee's use of leave, or in other words, retaliation for exercise of [FMLA] rights, is therefore actionable." *Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 865 (8th Cir. 2006) (citing *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 832 (8th Cir. 2002)). An employee can prove FMLA retaliation using a variant of the method of proof set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). *Smith*, 302 F.3d at 832. In order to prove a prima facie case of retaliation, Chinander must show that he exercised rights available to him under the FMLA, that he suffered an adverse employment action, and that there was a causal connection between his exercise of rights and the adverse employment action. *See Smith*, 302 F.3d at 832.

There is no dispute that Chinander took FMLA leave and that he was terminated. Andersen asserts, however, that Chinander cannot establish a prima facie case of FMLA discrimination because he cannot establish a causal connection between his FMLA leave and his termination. In particular, Andersen asserts that with the possible exception of Helm, no one involved in the decision to terminate Chinander knew of his FMLA leave; that the evidence demonstrates that Chinander was terminated because of theft, not his

7

FMLA leave; and because too much time elapsed between the beginning of Chinander's leave and his termination. Moreover, Andersen asserts that it had a legitimate, non-retaliatory reason to terminate Chinander and that Chinander can not demonstrate pretext.

To establish a causal link between Chinander's exercise of FMLA rights and his termination, Chinander must show that a retaliatory motive played a part in Chinander's termination. *See Hite*, 446 F.3d at 865. Chinander has pointed to record evidence that Helm knew of Chinander's FMLA leave. In addition, Helm was involved in the investigation into the theft allegations against Chinander, as well as discussions with Christenson and Kirby that ultimately led to Chinander's termination. In addition, the record establishes that Chinander both returned from medical leave and was terminated in July 2007.[4] Based on this evidence, the Court finds that Chinander has made a prima facie showing of causation. In doing so, the Court notes the "overarching philosophy of the *McDonnell Douglas* system of proof, which requires only a minimal showing before requiring the employer to explain its actions." *Smith*, 302 F.3d at 833.

Andersen has proffered a legitimate, non-retaliatory reason for terminating Chinander, specifically that Chinander took food from the cafeteria without paying.

---

[4] The record demonstrates that Chinander received nineteen weeks of unpaid leave. FMLA allows for twelve weeks of unpaid leave. While it might be reasonable to conclude that Chinander's medical leave continued for seven weeks after his actual FMLA leave expired, the record does not differentiate between Chinander's FMLA leave and his more general medical leave. For purposes of this motion, the Court will assume that Chinander returned from FMLA leave in July 2007.

Therefore, the burden shifts back to Chinander to point to some evidence that Andersen's reason is pretextual. *Smith*, 302 F.3d at 833 (8th Cir. 2002); *see also Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 779 (8th Cir. 1995) ("Has the plaintiff shown that the explanation extracted from the defendant by virtue of a *prima facie* case is a pretext for discrimination?"). To show pretext, Chinander must come forward with evidence that creates both (1) a question of fact as to whether Andersen's proffered reason was pretextual and (2) a reasonable inference that Andersen acted in retaliation. *Smith*, 302 F.3d at 833 (citing *Erickson v. Farmland Indus., Inc.*, 271 F.3d 718, 726 (8th Cir. 2001)). To carry this burden, Chinander must demonstrate that Andersen's justification for terminating Chinander is "unworthy of credence." *Id.*

Chinander concedes that the relevant inquiry here is whether Andersen *believed* Chinander was guilty of the conduct justifying his discharge, namely his alleged theft from the cafeteria. *See, e.g.*, *Soto v. Core-Mark Int'l., Inc.*, 521 F.3d 837, 842 (8th Cir. 2008) (noting that "the key question is not whether the stated basis for termination actually occurred, but whether the defendant believed it to have occurred"); *Scroggins v. Univ. of Minn.*, 221 F.3d 1042, 1045 (8th Cir. 2000). Chinander must demonstrate that when Andersen terminated Chinander, it was acting based on an intent to retaliate rather than on a good faith belief that he violated a workplace rule. *Richey v. City of Independence*, 540 F.3d 779, 785 (8th Cir. 2008).

Andersen maintains that Chinander was terminated because Andersen concluded that he took food from the cafeteria without paying for it. Andersen further maintains

9

that it has a long-standing, consistently enforced anti-theft policy.[5] Chinander contends that a question of fact exists as to Andersen's good faith belief that Chinander violated workplace rules. In support, Chinander asserts that: (1) Andersen has an informal policy allowing employees to pay later at the cafeteria; (2) Helm and Christenson were biased; (3) there is no evidence that Chinander did not pay as he claimed; (4) Chinander was honest throughout the investigation; (5) Helm conducted a faulty investigation; (6) Helm and Christenson misled their supervisors; (6) Andersen ignored its own policy; (7) Chinander received unfair treatment prior to his termination; and (8) Nowling lacked knowledge about the alleged theft incident.

The Court concludes that Chinander has failed to meet his burden of establishing pretext. First, Chinander points to record evidence that Andersen employees sometimes leave money on the back counter rather than pay the cashier for food that they took. Here, however, Andersen does not claim to have terminated Chinander because he paid by using the "honor system"; instead, Andersen's investigation led it to conclude that Chinander did not pay at all. Thus the evidence suggesting that there is an informal honor system in the Andersen cafeteria does not support a finding of pretext.

Next, Chinander asserts that Helm and Christenson, both of whom were involved in his termination, were biased. Chinander claims that Helm was hostile towards

---

[5] There is evidence in the record that it is Andersen's policy to terminate employees whom it believes have engaged in theft. (Merritt Aff. ¶ 2.) The record also demonstrates that prior to Chinander's dismissal, Andersen had terminated at least twelve other Bayport employees for theft, including employees who had taken food or beverages from the cafeteria. (Merritt Aff. ¶ 2-16.)

Chinander because he took FMLA leave.  In support, Chinander claims that he contacted Helm while he was on leave and that Helm would not call him back, sounded irritated when he did speak with her, would raise her voice with him, and would not answer his questions.  Specifically, in his deposition, Chinander states that he called someone at Andersen to discuss an adjustment that Andersen made on a paystub for April 2007.  (Chinander Dep. at 46.)  Chinander thought, but was not positive, that he spoke to Helm.  (*Id*. at 47.)  Chinander further testified that Helm could not answer his question and told him to call payroll or "Hartford" for help.  (*Id*. at 48.)  Chinander went on to say that Helm "wasn't happy with me calling" and said "I'm not the person to talk to about this."  (*Id*.)  Chinander talked to Helm again in July, when he requested that he be removed from the paint line and go back to work in the dip tank.  Chinander testified that Helm "wasn't happy," was "visibly upset," and "didn't seem to want to have anything to do with me anymore, she was trying to push it off on somebody else."  (*Id*. at 112-114.)  Based on this evidence, no reasonable juror could conclude that Helm was biased against Chinander because he took FMLA leave.  There is simply no evidence that Helm's alleged irritation with Chinander had anything to do with his FMLA leave or that any such irritation was a factor in Chinander's termination.

Chinander also asserts that Christensen was biased because he was aware of Chinander's reports of safety concerns shortly before his termination.  Chinander has pointed to evidence that Christenson was at a July 2007 meeting, during which Chinander's complaints were raised.  This could lead a reasonable juror to conclude that

Christenson was aware of Chinander's concerns at the time Chinander was terminated.[6] However, the mere fact that Christenson may have been aware that Chinander had some safety concerns does not, without more, lead to a reasonable inference of bias or retaliatory intent.

Chinander also takes issue with Andersen's investigation into the July 18 incident. Chinander asserts that there is no evidence that he did not pay, that he was candid during the investigation, that Helm's investigation was faulty, and that Helm and Christensen misled their supervisors. Even though Chinander factually disputes that he did not pay for his food on July 18, 2007, the record establishes that after its investigation, Andersen concluded that Chinander did not pay. While Chinander may disagree with the results of the investigation, the record simply would not lead a reasonable juror to conclude that Andersen's investigation was biased or based on a desire to retaliate against Chinander.

Chinander also contends that Andersen ignored a policy that provides that Andersen will review circumstances surrounding the reason for disciplinary action on a

---

[6] Andersen claims that its decision makers, including Christenson, did not know about Chinander's training complaint. Andersen cites to the following deposition testimony of Clayton:

> Q: . . . This concern about the dip tank, did you ever communicate anything or do you have any facts that would lead you to believe that Mr. Christenson knew that Mr. Chinander was the individual that raised these concerns?
>
> A: No.

(Clayton Dep. at 28-29.) While this evidence could also lead a reasonable juror to conclude that Christenson did *not* know that Chinander was the one raising safety issues, the Court must view the facts in the light most favorable to Chinander.

"case-by-case" basis. In particular, Chinander asserts that Andersen "robotically" concluded that it was required to terminate Chinander. The Court finds no merit to this argument. The record simply does not support a conclusion that Andersen's review was "robotic" or in any way a pretext for retaliation.

Chinander contends that pretext can be inferred because he received unfair treatment prior to his termination, and in particular because Steele issued Chinander an "unusual incident report" for allegedly accruing too many hours of unplanned time off. The Court disagrees. There is no evidence that this report was connected in any way to Chinander's termination.

Finally, Chinander asserts that pretext can be inferred because Nowling lacked knowledge about the alleged theft on July 18, 2007. Chinander points to the affidavit testimony of Scott Steenerson, who claims to have approached Nowling after Chinander was terminated and asked her if she knew anything about an Andersen employee who had been accused of stealing from the cafeteria. (Steenerson Aff. ¶ 7.) According to Steenerson, Nowling said that she did not. (*Id.*) Based on this testimony, Chinander asserts that fact issues exist over whether an investigation was ever done and, if an investigation was done, that this testimony calls into question the facts upon which Andersen based its termination decision. The Court declines to consider this testimony because it is hearsay and cannot be used to demonstrate pretext. *See Brooks v. Tri-Sys., Inc.,* 425 F.3d 1109, 1111 (8th Cir. 2005) (hearsay statement contained in an affidavit may not be used to support or defeat a motion for summary judgment).

For the reasons stated above, Chinander cannot establish pretext. Accordingly, the Court grants Andersen's motion for summary judgment on Chinander's FMLA claim.

## III.  Whistleblower Protection Act

In Counts Two and Three, Chinander asserts a claim of wrongful and retaliatory termination in violation of the Minnesota Whistleblower Act. The Minnesota Whistleblower Act prohibits retaliation against an employee who "in good faith, reports a violation or suspected violation of any federal or state law or rule adopted pursuant to law to an employer or any governmental body or law enforcement official." Minn. Stat. § 181.932, subd. (1)(a). *See also Cokley v. City of Otsego*, 623 N.W.2d 625, 630 (Minn. Ct. App. 2001).[7]

These claims are analyzed under the *McDonnell Douglas* burden-shifting test. *Cokley,* 623 N.W.2d at 630. Under this test, the employee must first establish a prima facie case of retaliatory discharge by showing: (1) statutorily protected conduct; (2) adverse employment action; and (3) a causal nexus between the two. *Cokley*, 623 N.W.2d at 630. If the employee can establish a prima facie case, the burden of

---

[7]  Chinander also asserts a claim under Minnesota Statutes § 182.654, which provides in part:

> No employee shall be discharged or in any way discriminated against because such employee has filed any complaint or instituted or caused to be instituted any proceeding or inspection under or related to this chapter or has testified or is about to testify in any such proceeding or because of the exercise by such employee on behalf of the employee or others of any right afforded by this chapter. Discriminatory acts are subject to the sanctions contained in section 182.669.

(Minn. Stat. § 182.654.)

production shifts to the employer to articulate a legitimate, non-retaliatory reason for its action. *Id.* If the employer meets its burden of production, the employee must demonstrate that the employer's articulated justification is pretextual. *Id.*

Chinander claims that he engaged in statutorily protected activity when he informed Andersen of workplace safety concerns regarding the training of individuals operating the dip tank. The record demonstrates that Chinander voiced his concerns, drafted a summary of his concerns, and that these concerns were passed on to various safety personnel at Andersen.

Andersen asserts that Chinander's Whistleblower retaliation claim fails because the facts alleged, if proven, do not demonstrate that Chinander's safety complaints implicate the violation of law. Andersen further asserts that Chinander cannot demonstrate a causal connection between Chinander's safety complaints and his termination; that Andersen had a legitimate, non-retaliatory reason to terminate Chinander; and that Chinander cannot establish pretext.

First, the Court concludes that Chinander has failed to establish a prima facie case of Whistleblower retaliation. To demonstrate that he engaged in statutorily protected conduct, Chinander must identify (1) a federal law or state law or rule adopted pursuant to the law that is implicated by his complaint; and (2) facts that, if proven, would constitute a violation of that law or rule. *Abraham v. County of Hennepin*, 639 N.W.2d 342, 345-55 (Minn. 2002). Chinander asserts that his reported safety concerns implicate Minnesota workplace safety statutes that require employers to furnish employees with workplaces free from hazards and to provide training related to hazardous substances

prior to requiring an employee to work with such substance.  *See*  Minn. Stat. §§ 182.653, subd. 2 and subd. 4b.

In his opposition, Chinander contends that Williamson lacked training on the equipment to use around the dip tank to avoid the risk of fire or explosion, various warning lights, how to handle spills, and how to operate the fire door.  In support of these contentions, Chinander points to his own deposition testimony wherein he lists the training he *thought* Chinander lacked.  Chinander also points to the following deposition testimony of Williamson:[8]

> Q: . . . Do you know whether or not these . . . other folks who primarily worked in the dip tank, had gotten any training on safety issues that you might not have?
>
> A:  I don't – I don't really know what all training they did get.  But as far as I did understand it, they did.  They were trained – extra training and – 'cause there's always training going on, ongoing.
>   . . .
>
> Q:     Did you indicate to [Chinander] that you felt like you could use some additional training to work in the dip tank?
>
> A:     Yes.

(May Aff. ¶ 2, Ex. 17 (Dep. of Bradley Williamson ("Williamson Dep.")) at 10, 12.) The Court notes that Williamson later testified that he "was trained in the dip tank for what I needed to do at the time."  (Williamson Dep. at 19.)

The Court concludes that the above record evidence on Williamson's training cannot support a prima facie case of Whistleblower retaliation.  In particular, these facts,

---

[8]    Williamson did not regularly work in the dip tank, but filled in for dip tank operators when they were not there.

if proven, would not demonstrate that Andersen violated Minnesota workplace statutes. While Williamson indicates that he thought that others who primarily worked in the dip tank received *more* training than him and that he told Chinander that he could use some additional training to work in the dip tank, there is simply nothing in the record that demonstrates that Williamson lacked any specific training that he was required to have under law. Accordingly, Chinander has failed to establish a prima facie case.

Even if Chinander could establish a prima facie case, Chinander's claim still fails on summary judgment. As discussed above, Andersen has met its burden of proffering a legitimate, non-retaliatory reason for terminating Chinander. Chinander relies on the same evidence that was discussed above in connection with Chinander's FMLA retaliation claim. For the reasons discussed above, Chinander has not met his burden to show that Andersen's reason was a pretext for retaliation.

## CONCLUSION

For all of the above reasons, the Court finds that Chinander has failed to demonstrate sufficient evidence that, if believed, would allow a reasonable jury to find for Chinander on his FMLA and Whistleblower retaliation claims. The Court, therefore, grants Andersen's motion for summary judgment and dismisses Chinander's complaint in its entirety.

Accordingly, **IT IS HEREBY ORDERED** that:

1. Andersen's Motion for Summary Judgment (Doc. No. 12) is **GRANTED**.

    2.    This matter is **DISMISSED WITH PREJUDICE** in its entirety.

    **LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  November 26, 2008        <u>s/Donovan W. Frank</u>
                                     DONOVAN W. FRANK
                                     Judge of United States District Court